IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

MAY 1996 SESSION

FILED

February 25, 1999

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 01C01-9505-CR-00181 |
| | ) | |
| | ) | Davidson County |
| v. | ) | |
| | ) | Honorable Seth Norman, Judge |
| | ) | |
| GERALD LEANDER HENRY, | ) | (First degree murder, attempted first degree |
| | ) | murder, especially aggravated kidnapping, |
| | ) | especially aggravated robbery, and two |
| Appellant. | ) | counts of especially aggravated burglary) |

For the Appellant:

Karl Dean
District Public Defender
    and
David M. Siegel
Senior Assistant Public Defender
1202 Stahlman Building
Nashville, TN 37201
(AT TRIAL & ON APPEAL)

Hollis I. Moore, Jr.
    and
David M. Siegel
Senior Assistant Public Defenders
1202 Stahlman Building
Nashville, TN 37201
(AT TRIAL)

For the Appellee:

Charles W. Burson
Attorney General of Tennessee
    and
Christina S. Shevalier
    and
Karen Yacuzzo
Assistant Attorney Generals of Tennessee
425 Fifth Avenue North
Nashville, TN 37243-0493

Victor S. Johnson, III
District Attorney General
    and
Kymberly Haas
Assistant District Attorney General
Washington Square, Suite 500
222 Second Avenue, North
Nashville, TN 37201-1649

OPINION FILED:_____

JUDGMENTS OF CONVICTION FOR FIRST DEGREE MURDER, ATTEMPTED
FIRST DEGREE MURDER, ESPECIALLY AGGRAVATED KIDNAPPING, AND
ESPECIALLY AGGRAVATED ROBBERY AFFIRMED; JUDGMENT OF CONVICTION
FOR ESPECIALLY AGGRAVATED BURGLARY RELATING TO WILLIAM REX
WEAVER VACATED AND CONVICTION AS MODIFIED TO AGGRAVATED
BURGLARY MERGED WITH THE ESPECIALLY AGGRAVATED BURGLARY
CONVICTION RELATING TO LARRY HARRINGTON; CONVICTION FOR
ESPECIALLY AGGRAVATED BURGLARY OF LARRY HARRINGTON AFFIRMED
BUT JUDGMENT MODIFIED TO REFLECT MERGER

Joseph M. Tipton
Judge

# O P I N I O N

The defendant, Gerald Leander Henry, appeals as of right from his convictions by a jury in the Davidson County Criminal Court for first degree murder, for attempted first degree murder, especially aggravated kidnapping and especially aggravated robbery, Class A felonies, and for two counts of especially aggravated burglary, Class B felonies. The trial court sentenced the defendant as a Range I, standard offender to life imprisonment for the murder conviction, to twenty years for each Class A felony conviction, and to ten years for each Class B felony conviction. The court ordered that the sentences imposed for the first degree murder and the attempted first degree murder convictions be served consecutively. The defendant contends that:

> (1) the evidence is insufficient to support his convictions;
>
> (2) the trial court erred by admitting the 9-1-1 tape of Larry Harrington asking for help;
>
> (3) the trial court erred by admitting a videotaped statement of Sean O'Brien, a codefendant, as a co-conspirator under Rule 803(1.2)(E), Tenn. R. Evid., as the conspiracy did not continue after both the defendant and O'Brien had been arrested, the fruits of the crime had been seized, and the defendant had given a confession;
>
> (4) the trial court erred by excluding the testimony of Dr. H.J. Francois because his name was not on a notice of experts filed pursuant to Rule 12.2(b), Tenn. R. Crim. P.;
>
> (5) his two convictions for especially aggravated burglary stemming from a single entry into a room violate the double jeopardy clauses of the United States and Tennessee constitutions;
>
> (6) the trial court erred by not dismissing the especially aggravated burglary counts because the element of serious bodily injury had already been prosecuted in two other counts of the indictment; and
>
> (7) the trial court erred by applying enhancement factors inappropriately, by finding that no mitigating factors applied, and by imposing consecutive sentences.

2

We affirm the judgments of conviction for first degree murder, attempted first degree murder, especially aggravated kidnapping, especially aggravated robbery and especially aggravated burglary relating to Larry Harrington. We reduce the conviction for especially aggravated burglary relating to William Rex Weaver to aggravated burglary pursuant to T.C.A. § 39-14-404(d). However, we merge the aggravated burglary conviction into the especially aggravated murder conviction relating to Larry Harrington because double jeopardy principles prohibit the entry of more than one judgment of conviction imposing more than one sentence for the burglary. We affirm the conviction for especially aggravated burglary of Larry Harrington but modify the judgment to reflect the merger of the aggravated burglary into the especially aggravated burglary.

Lillian Ewing testified that she was at the House of God Church around noon on July 16, 1992, with Dovie Shuford, a friend who lived in a dormitory room at the church. She said that as they were leaving, the telephone rang and she answered it. She stated that she heard a male voice ask for help. Ms. Ewing testified that Ms. Shuford thought that it was a prank telephone call, but she believed that the man sounded like he was seriously hurt. She said that she hung up the receiver, and the telephone rang a second time. She stated that when she answered the telephone, a man stated, "Help me. Help me. I've been shot. I've been shot." She said that he also told her that he was working for the church. Ms. Ewing testified that she and Ms. Shuford then drove to the other end of the church property where they believed the workers were located. She stated that as she drove around the dormitories near Heiman Street, she saw a man covered in blood on his knees barely open the door to a dormitory room and say, "Help me." Ms. Ewing said that as she turned the car around and drove toward Ms. Shuford's dormitory room to call the police, she saw police and firemen looking in the wrong direction. She directed them to the victim.

3

Paulette Weaver, the wife of the murder victim, testified that her husband worked for National Guardian Security Services. She said that he wore glasses and a work uniform and that each day he carried only enough cash to buy lunch.

Larry Harrington testified that he worked for National Guardian Security Services installing alarm systems and that he worked with Mr. Weaver, the murder victim. He stated that on July 16, 1992, he and Mr. Weaver were installing alarm systems on air conditioners at the House of God Church. He said that they parked the company's white, Astro van in front of the dormitory room in which they were working. He stated that they ate lunch in the van at approximately 12:30 p.m. Mr. Harrington testified that after he ate his lunch, he went inside the dormitory room in which they were working to call his wife on the telephone. He stated that Mr. Weaver remained in the van in the driver's seat finishing his lunch. Mr. Harrington said that while he was talking to his wife, he saw through the open door a white man and a black man, both of whom he did not know, standing at the passenger's door of the van. He identified the defendant as the black man. He stated that he did not see anything in the hands of either the defendant or the other man. Mr. Harrington testified that he hung up the telephone and just as he walked out the door, he saw Mr. Weaver climb out the passenger's side of the van. Mr. Harrington said that when he asked whether something was wrong, the man with the defendant pointed a gun at him and told him to raise his hands. He said that the two men told him and Mr. Weaver to go inside the room, cursed them, and told them to be quiet.

Mr. Harrington testified that he then saw Mr. Weaver raise his hands above his head and walk towards him, cooperating with the two men. He stated that he turned and walked inside the room followed by Mr. Weaver. He said that the defendant followed Mr. Weaver and that the other man followed them pointing the gun at Mr. Weaver. Mr. Harrington testified that the two men ordered them to lie face down on the

4

floor. He stated that Mr. Weaver went to the floor first. Mr. Harrington said that before he could get all the way to the floor, the defendant pulled his hands behind his back and bound them together with wire used to install the air conditioners. He said that the defendant also bound his legs together and then bound them together with his hands. Mr. Harrington described the procedure as being hog-tied. Mr. Harrington testified that he lay at Mr. Weaver's feet positioned so he could reach the telephone sitting on the corner of a table. He said that he did not resist the defendant and the other man.

Mr. Harrington testified that after he was bound, he heard a crash followed by a moan by Mr. Weaver. He stated that one of the men then said, "Here, use this to tie him up with." Mr. Harrington testified that he then heard a gunshot very close to him. Mr. Harrington was then shot in the back of the head. He stated that after being shot, he heard someone say, "Let's get the hell out of here." He then heard a door slam. Mr. Harrington said that he became unconscious for approximately five minutes. He testified that he was bleeding heavily. He said that he heard Mr. Weaver gurgling and that he saw a lot of blood coming out of his head and mouth, and his glasses were lying beside him on the floor. He said that Mr. Weaver was hog-tied and was not responsive.

Mr. Harrington testified that he was then able to remove his boots. He stated that he was also able to free his hands and grab the telephone. He said that he dialed 9-1-1 and a woman answered but hung up the telephone. He said that he dialed the number a second time and asked the woman for help. Mr. Harrington testified that he dialed the number a third time and spoke to the 9-1-1 operator. He said that he told her that he and Mr. Weaver had been shot and needed help. He stated that while talking to the woman, he went to the door, opened it a little, looked outside, and then put the chain lock on the door. He said that the woman told him help was on the way. The audio cassette tape of the 9-1-1 emergency call was introduced as an exhibit and played for the jury.

5

Mr. Harrington testified that he saw a car with two people inside pull into the parking lot and turn around and leave. He said that shortly afterwards, the police and ambulance arrived and he was taken to the hospital for treatment. Mr. Harrington testified that he remained conscious until he went into the emergency room and that when he awoke, he saw news footage on the television showing that the defendant and Sean O'Brien had been caught. He said that he had no doubt that the two men shown on the news footage were the ones who had forced him and Mr. Weaver into the room and shot them. Mr. Harrington identified the gun that was used by the man that was with the defendant.

Mr. Harrington stated that he was hospitalized for thirteen days. Mr. Harrington said that he suffered a broken jaw, that he permanently lost his hearing in his right ear, and that he no longer had perfect vision. He said that he was hospitalized again for plastic surgery and for surgery to implant a gold weight in his eyelid to allow it to close.

Mr. Harrington testified that he did not notice anything peculiar about the defendant. He said that the defendant did not appear to be scared or under duress. He stated that the defendant was not shaking. Mr. Harrington described the defendant as a person who had done the acts before or would not think much about doing the acts. He said that the defendant did not appear to be mentally unsound. Mr. Harrington stated that the defendant acted like he knew what he was going to do before he got to the church.

Sergeant Gary Young of the Nashville Metropolitan Police Department testified that he was dispatched to the church but that the police and the ambulance had difficulty finding the victims. He said that he eventually saw a dormitory room door open about one foot. He stated that he found Mr. Harrington and Mr. Weaver inside.

6

Sergeant Young testified that Mr. Weaver had been hog-tied and shot in the back of the head execution style, and he stated that it was apparent that Mr. Weaver was dead because of the amount of blood, brain matter, and fragments of teeth that surrounded him. He said that he assisted Mr. Harrington, who was still bleeding, by placing a pillowcase under his jaw. He stated that Mr. Harrington had lost a lot of blood. Sergeant Young testified that when he asked Mr. Harrington who had done this to him, Mr. Harrington told him it was a black man and a white man.

Sergeant Young identified four photographs of the scene. The photographs show Mr. Weaver lying face down on the dormitory floor with his hands and legs tied together. They show the wound to the back of Mr. Weaver's head and blood and brain matter surrounding his head. A spent shell casing and fragments of a broken lamp are lying near Mr. Weaver's head, and another blood spot appears near Mr. Weaver's feet. The photographs reveal wire wrapped around a pair of boots lying near Mr. Weaver's head with the receiver of the telephone lying near the boots. Blood is on both the receiver and the telephone. The photograph also depicts a pair of glasses lying between the boots and Mr. Weaver's head.

On cross-examination, Sergeant Young testified that the victims were shot by a large caliber weapon at a relatively close range. He believed that the victims were not shot accidentally and that the shooter intended to kill or seriously injure the victims given the nature of the shootings.

Officer Wayne Hughes of the Nashville Metropolitan Police Department testified that he retrieved a total of three .45 caliber shell casings and ten bullet fragments at the scene, with one of the shell casings lying near Mr. Weaver's head. He stated that he collected lamp fragments near Mr. Weaver's body. Officer Hughes also stated that the wires from the broken lamp were used to tie Mr. Weaver.

7

Lieutenant Ben Joyner of the Tennessee Highway Patrol testified that on July 16, 1992, he received information to be on the lookout for a Sonitrol van heading west on Interstate 40. He said that he spoke to a truck driver who told him that he had seen the van in Jackson. He stated that at about 2:00 p.m., he saw the van exit the interstate where he was parked on the exit ramp. Lieutenant Joyner testified that he, along with other officers in marked and unmarked units, followed the van. He stated that they tried to stop the van by radioing a truck driver and having him slow down, but the van switched lanes and drove around the truck. Lieutenant Joyner said that they set up a roadblock because the van was heading back toward the interstate. He stated that the van stopped at the roadblock momentarily but then headed toward two police officers. Lieutenant Joyner stated that Sean O'Brien, the driver of the van, then increased his speed and drove through the roadblock. He stated that O'Brien drove the van at speeds up to one hundred miles per hour, ran a red light, and forced vehicles off the road, including a police car. He said that the chase occurred in a populated area.

Lieutenant Joyner testified that the van eventually skidded to a stop at a second roadblock approximately four miles from the first roadblock. He said that when the van stopped, the officers ordered the defendant and O'Brien to get out and to lie on the ground. He stated that the defendant complied with the orders but that O'Brien refused to get out of the van. He testified that they had to open the door and pull O'Brien out of the van. Lieutenant Joyner testified that the defendant appeared to understand the officers' orders and that the defendant did not act abnormally.

On cross-examination, Lieutenant Joyner testified that shots were fired at the van when O'Brien tried to run over the officers at the first roadblock. He stated that he found a clip for a pistol in O'Brien's front pocket. He said that he also recovered a gun in a wooded area on Pipkin Road after the defendant gave directions to where he threw the gun. On redirect examination, Lieutenant Joyner testified that it would have

8

been possible for someone to get out of the van when it stopped momentarily before the first roadblock.

Officer Ronnie Jackson of the Jackson Police Department testified that the defendant appeared to understand and did not appear disassociated with reality when he got out of the van. He described the defendant as cooperative. Officer Jackson stated that hollow-point bullets cause a larger wound. On cross-examination, Officer Jackson testified that a person using hollow-point bullets should know that they inflict massive damage.

Detective Larry Flair of the Nashville Metropolitan Police Department testified that he and Officer Pat Postiglione went to the Tennessee Highway Patrol headquarters in Jackson after the defendant and O'Brien had been arrested. He stated that they arrived at approximately 5:00 p.m. and that the defendant and O'Brien were being kept in separate rooms. He stated that O'Brien refused to give a statement. He said that he read the defendant his rights, and the defendant gave an oral statement but refused to allow the officers to tape the statement. Detective Flair stated that the defendant told them that he did not know that O'Brien was going to rob or shoot anyone. He testified that the defendant asked on two different occasions about how much time they thought that he would get. Detective Flair stated that there was no question that the defendant was in full possession of his mental faculties. He said that the defendant did not behave abnormally. He said that the defendant did nothing to make him believe that he had mental problems.

Detective Flair testified that the defendant described in detail the location where he threw the pistol out of the van during the pursuit by police, and the defendant accompanied the officers to locate the Colt .45 automatic handgun. He said that they found the gun in a cocked position with a hollow-point bullet in the chamber and a

9

hollow-point bullet in the clip.  Detective Flair testified that he and Officer Postiglione drove the defendant and O'Brien to Nashville.  He said that they stopped at the wrecker service to photograph the stolen van along the way.  He stated that the defendant did not act out of the ordinary during the two-hour ride.

On cross-examination, Detective Flair testified that he found jewelry on O'Brien.  He said that his investigation showed that there were outstanding charges against O'Brien for burglarizing his girlfriend's home and taking jewelry in New Hampshire.  He stated that his investigation also showed that O'Brien had stolen the Colt .45 automatic handgun in Florida.  Detective Flair testified that at least five bullets had been loaded into the gun clip.  He expressed the opinion that O'Brien had killed someone before given the cruel nature of the shootings in this case.  Detective Flair said that he learned during his investigation that O'Brien had hit Mr. Weaver with a lamp and that the broken lamp and lampshade were placed in the van.  He stated that he found a lamp and a lampshade in the van.

Detective Flair conceded that he had spoken to other persons who were under the influence of alcohol or drugs or had a mental illness but could still be understood.  He admitted that it was possible for someone to act normally although they were not normal.  He identified several items worn by the defendant, a T-shirt, an elastic band, a necklace, a charm, a pair of blue jeans, a brown leather belt, and a red, long-sleeve thermal shirt.  He stated that the offenses occurred in mid-July on a normal

10

summer day. On redirect examination, Detective Flair stated that he believed that the defendant was very involved in the crimes if he bound the victims.

Officer Pat Postiglione of the Nashville Metropolitan Police Department testified regarding the oral statement given by the defendant. He said that the defendant told the officers that he met O'Brien for the first time when he arrived at Truckstops of America in Nashville on July 14 or 15, 1992. The defendant told the officers that he and O'Brien planned to go to California together and that they went to his mother's house to tell her goodbye before leaving for California on July 16. The defendant said that they did not have a vehicle for the trip. He said that as they approached the House of God Church, O'Brien removed a .45 automatic gun from the duffle bag he was carrying and walked over to a white van in which Mr. Weaver was seated in the driver's seat. The defendant told the officers that O'Brien then used the gun to force Mr. Weaver out of the van through the passenger's side door. The defendant claimed that he did not know that O'Brien had the gun with him until he removed it from the bag. The defendant told the officers that once inside the dormitory room, O'Brien ordered him to tie the victims and he complied. The defendant stated that O'Brien then fired the gun three times, shooting first into the floor and then into the two victims. He claimed that he did not know or ask why O'Brien shot the victims. The defendant told the officers that they left very quickly, that they took a lamp with them and that they drove away in the van.

Officer Postiglione testified that the defendant told him and Detective Flair that he and O'Brien got on the interstate going west toward California. The defendant stated that he was aware that they were being pursued by the police. He described the weapon used by O'Brien as a .45 chrome-colored automatic handgun and stated that he threw the gun out the window into a field as ordered by O'Brien when they were

11

being chased by the police. The defendant provided a detailed description of the location where he threw out the gun, and he accompanied the officers to locate the gun.

Officer Postiglione testified that the defendant did not do or say anything during the interview or during the drive to Nashville to make him believe that the defendant was mentally ill. He said that the defendant was nervous but calm during the interview and that he asked a couple of times how much time the officers thought he would get. Officer Postiglione believed that the defendant appeared in control of the situation. He stated that the defendant never asked about the victims but rather was more concerned about his sleeping and eating arrangements. Officer Postiglione testified that the defendant never mentioned hearing voices or having hallucinations. He said that the defendant told the officers that he had no permanent address, but he gave the officers his mother's address and told Officer Postiglione that he had been in Knoxville.

Officer Postiglione testified that when they arrived in Nashville at approximately 8:00 p.m., the defendant and O'Brien were booked and then placed in an interview room where there was a hidden camera. He stated that this was the first time that the defendant and O'Brien were together without the presence of officers since their arrest. He said that a conversation between the defendant and O'Brien was videotaped. The videotape shows the defendant and O'Brien planning what they were going to say to the police regarding the events surrounding the offense. It also reflects that the defendant and O'Brien discussed their history of mental illnesses and the possibility of escaping liability based on their mental condition.

On cross-examination, Officer Postiglione identified the clothing that the defendant was wearing when he was arrested. He stated that the defendant was wearing a red thermal, long-sleeve shirt, a T-shirt, a pair of blue jeans, a leather belt and loafers. Officer Postiglione believed that the defendant was homeless because he

was wearing layers of clothing in a manner similar to that of a homeless person. He said that at the time of his arrest, the defendant carried a bag that contained clothing, a religious cassette tape, religious books, a lava rock, a jar containing a clay-like substance, duct tape, a needle, thread, and a brace. Officer Postiglione testified that criminals often take items necessary for their escape, but he conceded that he did not know how some of the items possessed by the defendant would aid an escape.

Officer Postiglione said that he found a gun case for the stolen gun in O'Brien's duffle bag. Officer Postiglione testified that O'Brien's fingerprints were found on the clip that was discovered by police. He also testified regarding his interview of Mr. Harrington the day after the offenses occurred. He said that Mr. Harrington described O'Brien as the leader of the offenses and stated that the defendant stood back and did not say anything. Officer Postiglione testified that Mr. Harrington told him that he did not know who bound him but that he believed that O'Brien shot them because he saw O'Brien enter and leave with the gun. Officer Postiglione conceded that his investigation also reflected that O'Brien was the leader, given the fact that O'Brien possessed and used the gun and that the defendant participated only by tying the victims.

Officer Postiglione testified regarding Mr. Harrington's condition two weeks after the offenses occurred. He said that Mr. Harrington remained in intensive care and that the right side of his face was extremely swollen, that his jaw was wired shut, and that he was in pain and could barely speak. Officer Postiglione believed that the defendant knew O'Brien planned to shoot the victims and take their van because they had spent forty-eight hours living together on the street, because they did not have a vehicle for the trip to California, and because of the manner in which the victims were shot. He also believed that the defendant and O'Brien planned on eliminating any risk of having witnesses to the crimes by shooting the victims.

13

Detective Harold Haney of the Nashville Metropolitan Police Department testified that he monitored the defendant and O'Brien while they were being held in the interview room together in Nashville. He said that he saw the defendant take something out of his pocket and hide it under the table. He stated that he entered the room and found a spent shell casing from a .45 caliber automatic weapon.

Officer Tommy Welder testified that he went to the morgue in response to a call from the pathologist. He said that he found a small piece of glitter near a laceration on the victim's head. A photograph was introduced depicting the area where the glitter was found.

Don Carman, a forensic scientist with the Tennessee Bureau of Investigation specializing in firearms identification, testified that he examined the Colt .45 semi-automatic handgun and said that the gun functioned properly. He stated that he also examined the bullet fragments recovered from Mr. Weaver and those sent to him. He said that the fragments were very small and were from hollow, lead-core bullets that had been mutilated. Mr. Carman testified that the fragments had some general rifling characteristics similar to those fired from the Colt .45 semi-automatic handgun but that they were insufficient to be considered a match. He stated that he analyzed a clip and two .45 caliber, hollow-point bullets and said that they could be used in the Colt .45 semi-automatic handgun. On cross-examination, he stated that a characteristic of a semi-automatic gun is that the trigger has to be pulled each time it is fired. He said that the Colt .45 semi-automatic handgun had a six pound trigger pull.

Officer Ralph Deavers testified that he looked for latent fingerprints on items in the dormitory room as well as on the broken lamp, the Colt .45 semi-automatic handgun, and the clip taken from O'Brien's pocket. He said that the only fingerprints he could identify were O'Brien's fingerprints on the clip.

Dr. John Werther testified that he examined Mr. Harrington on July 16 in the emergency room. He said that Mr. Harrington had a wound on the back side of his neck and in front of his cheek. Dr. Werther stated that the bullet exited below the cheekbone causing severe damage, including swelling of the face and bruising of the eye area. He testified that Mr. Harrington suffered damage to his ear canal and eye socket. He stated that Mr. Harrington also suffered damage to the nerve that controls raising the forehead, closing the eyes, wiggling the nose, and moving the lips and neck, causing facial palsy. Dr. Werther testified that as a result of the facial palsy, Mr. Harrington had to have a gold weight placed in his eye so that it would shut and to prevent it from drying out. He said that the jawbone was shattered into twenty to thirty pieces and that the external carotid artery that supplies the face with blood was severed. Dr. Werther described Mr. Harrington's injury as being painful and life threatening, as the likelihood of infection was great. He testified that additional surgeries were required after Mr. Harrington was released from the hospital. He stated that he operated on Mr. Harrington's neck because the bullet was close to his spine, causing him to have pain and numbness in his arm. Dr. Werther said that a bone graft from Mr. Harrington's hip was used to fuse his cervical spine. He stated that he also reconstructed Mr. Harrington's cheekbone and his nose because it had collapsed, making it difficult to breathe. Dr. Werther testified that plastic surgery was also necessary.

Dr. Jessie Giles, the medical examiner for Davidson County, testified that he reviewed the records of Dr. Gretal Harlan, an assistant medical examiner who conducted the autopsy of William Rex Weaver. He stated that the records show that Mr. Weaver died as a result of a gunshot wound to the head, causing damage to the skull and tearing and bleeding of the brain. Dr. Giles testified that the bullet entered at the top of the head and did not exit. He stated that he was unable to determine the distance from which the victim was shot. He said that there were contusions and

15

bruising around the eye as a result of the skull fractures. He also said that there was a tear at the back of the head with some abrasion resulting from the application of blunt force. Dr. Giles testified that the victim suffered two other lacerations to the head. Dr. Giles expressed the opinion that the victim could have died instantly but that most likely the victim was rendered unconscious, possibly by the laceration to the head, and then died very quickly.

Shelly Betts, a serologist for the Tennessee Bureau of Investigation, testified for the defense. She stated that she examined the clothing of the defendant and O'Brien and that she found reddish-brown stains appearing to be blood on O'Brien's boots and pants. She said that the stains tested presumptively positive as blood stains, although she was unable to confirm the finding. Ms. Betts testified that she found no blood stains on the defendant's clothing.

Dr. Amin Azimi, a licensed psychologist with the Middle Tennessee Mental Health Institute (MTMHI), testified that he conducted two psychological evaluations of the defendant after the commission of the offenses. He stated that as a part of the evaluations, he reviewed the defendant's medical records from the defendant's 1989 hospitalization in Illinois after being picked up by the police. He said that the records showed that the defendant suffered a brief psychotic reaction, and the defendant claimed that he saw spiders, that he saw snakes biting him, and that he heard voices telling him to go away. Dr. Azimi described a brief psychotic reaction as a disorder characterized by a breakdown of reality lasting for hours or months as a result of a severe psycho-social stressor. He testified that a person having a brief psychotic reaction may appear normal one to two months afterwards.

Dr. Azimi testified that he was concerned about the defendant's psychological state because the defendant acted oddly in that he was evasive and

secretive, he lacked concern for himself with respect to the outcome of the case, and he paced the floor. He stated that the defendant reported having visual and auditory hallucinations. Dr. Azimi testified that the defendant claimed that he had heard voices for several years. He said that the defendant told him that he sometimes heard several voices at one time and that he would leave when this happened. Dr. Azimi testified that the defendant told him that he coped with the auditory hallucinations by inflicting pain on himself and by pacing the floor. He said that the defendant was vague and evasive about his mental status. He stated that the defendant was also vague about whether he mutilated his genitals. He stated that he found a needle in the defendant's possession.

Dr. Azimi acknowledged that the defendant was found to be competent to stand trial and not committable and that an insanity defense was not supported by the facts of the case. He conceded that although the defendant became more cooperative with the staff, the defendant was unable to remain free from hallucinations for two weeks and his oddities continued. Dr. Azimi described the defendant as a follower, but he stated that the defendant was not dangerous. He diagnosed the defendant as having an atypical psychosis, a mental illness or disorder that causes hallucinations, delusions and odd conduct. Dr. Azimi said that the defendant's illness was a continuing one, unlike a brief reactive psychosis.

On cross-examination, Dr. Azimi testified that the defendant was hospitalized in Illinois for less than two days and was released without medication or follow-up treatment. He stated that the hospital staff attended to the defendant after the police arrested him for disorderly conduct because he was knocking on doors in a neighborhood and asking to use the telephone to call his father. He said that the defendant was diagnosed in Illinois as having a brief psychotic reaction due to his lack

17

of sleep and food, and he stated that all of the defendant's symptoms disappeared once the defendant ate and slept.

Dr. Azimi acknowledged that the defendant had told another doctor that he had not heard voices when he met O'Brien or before the offenses occurred. He also acknowledged that the defendant had told a social worker that he knew that O'Brien had a gun because they had shot it in the alley. The defendant also told the social worker that when O'Brien ordered him to tie the victims, he refused and instead held the gun on the victims while O'Brien tied them. Dr. Azimi testified that the defendant told the social worker that the gun had accidentally discharged.

Dr. Azimi conceded that the defendant had no organic brain injury and that he had stated in his report that the defendant's symptoms did not suggest a serious mental illness and did not require medication. He also admitted that the defendant's behavior during interviews did not raise a question of delusional thinking or hallucinations, but rather the defendant was often lucid, coherent and rational. Dr. Azimi explained that the defendant told him that he heard voices when he was by himself and that when he was active, the voices went away. He said that the defendant's vocabulary, reasoning and memory were within the normal range of intelligence. Dr. Azimi testified that the defendant lacked concern about the outcome of the case in that he admitted his guilt and stated that he should be punished. He explained that it was possible that the defendant recognized the reality of a sentence during the two years of incarceration pending the trial.

On redirect examination, Dr. Azimi testified that the defendant would be influenced by O'Brien being armed with a weapon because the defendant was a follower. He said that the defendant could shut down under some circumstances. He stated that a person can be mentally ill even though the person is intelligent or does not

have any organic brain injury. Dr. Azimi conceded on recross examination that the defendant did not tell him that he was under stress or that he heard voices or saw snakes at the time of the offenses or when he was fleeing from the police. However, he said that the defendant told him that he left the dormitory room after O'Brien fired the second shot because he heard voices telling him to leave.

Dr. H.J. Francois, a physician at MTMHI, testified that he performed a physical examination of the defendant. He said that he found a lesion in the right testicle in the groin. He stated that his findings were normal, except for an enlarged right testicle.

Several of the defendant's family members testified regarding the defendant's unusual behavior since 1989. His wife testified that the defendant had been living with her and her three children for five years when he left and went to Nashville for no reason in 1989. She said that the defendant appeared very confused when he left and that he took no money with him, and he carried only a small duffle bag. The defendant's wife testified that the defendant called her when he arrived at the bus station in Nashville and told her that he was going to a hotel with a prostitute. She stated that the defendant also called her when he was hospitalized in Illinois in 1989 and that he told her that he had been arrested for hitchhiking and that a big bear had followed him.

The defendant's wife testified that the defendant's behavior changed again in November 1990 when he told her and her family that he had to follow the Trail of Tears. She said that the defendant also told her that he felt that someone was calling him and that he felt wind blow through the house and knock him down. She stated that the defendant carved a walking stick to take with him and that he told her that it was to keep the dogs away. She testified that the defendant left again with no

19

money for approximately two weeks. She said that the defendant called her from Memphis and she sent him a bus ticket to come home. The defendant's wife testified that the defendant did not explain why he had left when he returned home. She stated that the defendant was normally a neat person, but when he returned home, his clothes were torn and his hair was out of place. She testified that on both occasions that the defendant left home, he was employed and their relationship was good. She stated that after the second occasion, he was not interested in working, but instead he stayed home all day watching television and reading the Bible, although he had shown no interest in religion before he left home.

The defendant's wife testified that the defendant left a third time and stayed gone for approximately two to three weeks. She stated that the defendant called her from Jackson, Mississippi and asked her to move there with her children, although he had no job or housing arrangements. She said that she eventually purchased a bus ticket and sent it to him, and the defendant returned home. The defendant's wife testified that she stopped living with the defendant in February 1991 and had little contact with him. She conceded that she knew nothing about the defendant's mental status in 1992 when the offenses occurred.

The defendant's father and stepmother testified that they picked up the defendant in Illinois after the defendant had been in the hospital there in 1989. They said that the defendant was distant and that he told them that he was hitchhiking to St. Louis. They stated that the defendant did not have any clothes with him and that they had to pick up the defendant's clothes at a bus station in Nashville. They testified that they then took the defendant with them to stay in Chattanooga. They said that the defendant's grandfather gave the defendant a car while he was there, but the defendant did not drive it. The defendant's father and stepmother stated that they

20

offered to send the defendant to chef school, but he left and went to Nashville. They said that he did not take any money or his car with him.

The defendant's father and stepmother both testified that they did not see or hear from the defendant until May 1992 when the defendant came to stay with them in Chattanooga. They said that the defendant had changed his appearance in that he wore bands in his long hair, a bag on a rope around his neck, and old clothes that were not appropriate for the weather. The defendant's father stated that the defendant wore tailored suits and had short hair before his condition changed. The defendant's father and stepmother testified that the defendant also wore Ace bandages very tightly around his waist, legs, wrists and arms. They said that the bands around the defendant's arms were so tight that he could barely bend his arms, and they caused his arms to swell and become discolored. They stated that the defendant also wore a headband wrapped tightly around his head. The defendant's father and stepmother testified that the defendant explained his appearance by telling them that it was related to his Hindu religion.

The defendant's father and stepmother testified that the defendant's behavior also changed. They stated that he scratched himself all over with a piece of pumice rock, and he kept an electric knife under his bed. The defendant's stepmother testified that the defendant told him that he scratched himself because he felt things crawling on him, although nothing was on his skin. The defendant's father and stepmother testified that the defendant usually sat in his room and did nothing but that he also walked a lot and would often leave for several hours before returning home. They said that the defendant carried a Bible with him at all times and that he had more than one Bible. They offered to get the defendant an apartment and let him operate their ceramic shop, but he left again in June 1992 under similar circumstances. The defendant's stepmother stated that the defendant called her two or three times after he

21

left asking her for money, but she said that she had no physical contact with the defendant until after he was arrested in July. On cross-examination, the defendant's stepmother testified that she and the defendant's father never sought mental health assistance for the defendant.

Dr. Pamela Auble, a clinical psychologist, testified that she conducted a psychological evaluation of the defendant in June 1994. She stated that she did not conduct any independent psychological testing but rather relied upon Dr. Azimi's results of testing conducted approximately one week earlier. She stated that she also reviewed the defendant's school records, the records from earlier psychological evaluations, letters from counsel, and police records, including photographs of the scene and the videotape of the conversation between the defendant and O'Brien.

Dr. Auble testified that the defendant had a history of odd behavior, including pacing with his head tilted sideways or with shaving cream on his nose, carrying food in his pocket, or keeping food in his room until it fermented. She said that the defendant had also heard voices for many years. She explained that the defendant told her that he often heard seven or eight voices at one time and that he was not always able to understand the voices. Dr. Auble testified that the defendant told her that the voices disturbed him and caused him to become tense when the voices were too loud or too many. She stated that the defendant controlled the tension by inflicting pain on himself. She said that the defendant told her that the voices instructed him to inflict pain on himself. Dr. Auble stated that the defendant used a method called acupressure where he placed thick bands tightly around various parts of his body, including his genitals. Dr. Auble said that the defendant told her that if acupressure did not work, he would stick himself with a pen, rub his skin raw, exercise excessively, or pace continuously.

22

Dr. Auble diagnosed the defendant as having an atypical psychosis, a major mental illness. She said that the defendant's condition worsened when he was tired or under stress. She also stated that the defendant was not a violent person and that he would withdraw from a tense situation. Dr. Auble expressed the opinion that because of his illness, the defendant was not able to deal with stress as a normal person would. Dr. Auble believed that the defendant did not form the specific intent to harm anyone.

On cross-examination, Dr. Auble testified that she believed that the defendant was not an active participant in the crimes. She said that the defendant told her that O'Brien ordered him to tie the victims and gave him wire to do so but that he told O'Brien that he could not do it after he started to tie the victims. Dr. Auble acknowledged that the doctors at MTMHI found no evidence of a serious mental illness, although they also diagnosed the defendant with an atypical psychosis. She believed that the diagnosis by the doctors at MTMHI was indicative of a serious mental illness.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his convictions. He argues that the evidence is insufficient (1) because there is no evidence of his intent, premeditation and deliberation to kill the victims, (2) because there is no evidence of his knowing participation in the crimes, and (3) because the evidence of his serious mental problems negated any showing that he knowingly participated in the crimes. The state responds that there is sufficient evidence to establish beyond a reasonable doubt the defendant's guilt of the offenses. We agree.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, _any_ rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence, but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

First, the defendant asserts that there is insufficient evidence to show that he premeditated, deliberated or intended to kill the victims when he entered the dormitory room to establish his guilt beyond a reasonable doubt for the offenses of attempted first degree murder and especially aggravated burglary. He argues that the proof, at most, supports a conviction for attempted second degree murder. The defendant acknowledges that the facts show some degree of acquiescence or participation by the defendant in robbing and kidnapping the victims, but he contends that the jury could just as reasonably infer an intent not to kill but rather to immobilize and leave the victims unharmed after their being bound. However, the jury obviously did not believe the defendant's assertion of limited involvement. It is not this court's function to reweigh the evidence, and the guilty verdict, approved by the trial court, resolves all conflicts in the testimony in favor of the state. State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978).

The defendant was charged with and convicted of attempted first degree murder. To be guilty of criminal attempt, the defendant must have acted with the kind of culpability necessary for first degree murder. See T.C.A. § 39-12-101. At the time of the offense, first degree murder was defined as the unlawful, intentional, premeditated and deliberate killing of another. T.C.A. §§ 39-13-201, -202(a)(1) (1991). Our criminal code defined a deliberate act as "one performed with a cool purpose," and a premeditated act as "one done after the exercise of reflection and judgment." T.C.A. § 39-13-201(b)(1)-(2) (1991). The defendant was also charged with and convicted of two

24

counts of especially aggravated burglary. To be guilty of especially aggravated burglary as charged in separate counts of the indictment, the defendant must have burglarized the House of God Church with the intent to commit first degree murder, and William Rex Weaver and Larry Harrington must have suffered serious bodily injury. See T.C.A. §§ 39-14-402, -404(a).

Viewing the evidence in the light most favorable to the state, the jury could have concluded beyond a reasonable doubt that the defendant premeditated, deliberated and formed the intent to kill the victims. The evidence shows that the defendant and O'Brien planned to go to California and that the defendant had gone to his mother's house to say goodbye before leaving for California on July 16. The defendant and O'Brien did not have a vehicle for the trip. As the defendant and O'Brien were walking toward the House of God Church, O'Brien removed the .45 Colt semi-automatic gun loaded with hollow-point bullets from the dufflebag he was carrying and walked over to the van in which Mr. Weaver was sitting. The defendant knew that O'Brien had a gun because they had shot it in an alley. O'Brien then forced Mr. Weaver and Mr. Harrington into the dormitory room at gunpoint, and the defendant followed them inside.

The evidence shows that once inside the dormitory room, the defendant and O'Brien ordered the victims to lie face down on the floor, but before Mr. Harrington could get all the way to the floor, the defendant pulled Mr. Harrington's hands behind his back and used wire to tie them together as he forced him to the floor. Mr. Harrington testified that the defendant did not appear to be scared. The defendant then bound Mr. Harrington's feet together with the wire and then bound his feet to his hands. After Mr. Harrington was bound, Mr. Weaver was hit in the head with a lamp, knocking him unconscious. O'Brien then gave the defendant the electrical wires from the lamp, and the defendant hog-tied Mr. Weaver. O'Brien then shot the victims in the head,

25

killing Mr. Weaver and severely injuring Mr. Harrington. The defendant and O'Brien immediately left the church, taking the victim's van as transportation for their trip to California. We believe that based on this evidence, any rational juror could have found beyond a reasonable doubt the essential elements of attempted first degree murder and especially aggravated burglary.

The defendant's second contention regarding the sufficiency of the evidence is that the evidence is insufficient to show that he knowingly participated in any of the offenses. Specifically, he asserts that his conduct supported a conviction of only facilitation of the crimes of first degree murder, especially aggravated kidnapping, and especially aggravated robbery. Although the defendant concedes that Mr. Harrington's testimony that the defendant bound him would by itself demonstrate his knowing participation in the offenses, he argues that there was other substantive evidence that contradicted the testimony and showed his limited involvement. However, as stated earlier, conflicts in the evidence are resolved in favor of the state when a guilty verdict is approved by the trial court. Hatchett, 560 S.W.2d at 630. Also, the trial court instructed the jury on facilitation of the crimes, and the jury rejected the theory, obviously concluding that the evidence supported convictions for first degree murder, especially aggravated kidnapping and especially aggravated robbery. The evidence supports those conclusions.

Third, the defendant argues that the evidence is insufficient to support his convictions given the evidence of his serious mental problems. He contends that the expert, psychiatric testimony and the lay testimony of the defendant's mental illness negated any showing that the defendant knowingly participated in the offenses. The state responds that there is no evidence to show that the defendant experienced any kind of psychotic episode when he committed the offenses. We believe that there is some evidence that the defendant experienced a psychotic episode near the time of the

26

offenses, given the defendant's odd behavior shortly before the offenses took place. Nevertheless, the evidence supports the jury's decision that the defendant was able to form the requisite culpable mental state to commit the offenses charged. See State v. Hall, 958 S.W.2d 679, 688-92 (Tenn. 1997). The evidence is sufficient to support the defendant's convictions.

## II. ADMISSION OF VIDEOTAPED STATEMENT

The defendant contends that the trial court erred by admitting the videotaped statement as a statement by a co-conspirator made during the course of and in furtherance of the conspiracy, an exception to the hearsay rule under Rule 803(1.2), Tenn. R. Evid. The state responds that the videotaped statement was properly admitted.

The defendant filed a motion to exclude the videotaped conversation between the defendant and O'Brien, asserting that the evidence constituted inadmissible hearsay, and the introduction of the evidence would violate the Confrontation Clause of the United States Constitution and the Tennessee Constitution. He argued that the videotaped conversation did not fall within the co-conspirator statement exception to the hearsay rule because the statements were not made during the course of the conspiracy. Although he acknowledged that O'Brien was available to be called as a witness because O'Brien had entered a guilty plea and was in jail at the time, the defendant argued that the videotape was inadmissible because its admission would violate his right to confrontation. He asserted that a different issue was presented if the state wanted to redact the videotape. The state responded that the videotape was admissible as a statement made by a co-conspirator. It also contended that it was impossible to redact the videotape. The defendant countered that the conspiracy had ended at the time of the videotaped conversation because the defendant and O'Brien had been arrested, and the defendant had given an

27

incriminating statement.  The state asserted that the conspiracy was ongoing because the defendant and O'Brien were taking steps to conceal the crime or thwart the prosecution.

The trial court ruled that the videotape was admissible under the co-conspirator statement exception to the hearsay rule.  The court did not state the nature of the conspiracy, but it ruled that the conspiracy had not ended at the time of the conversation between the defendant and O'Brien.  The trial court also noted that O'Brien could be subpoenaed by either party, given that he was confined in the local jail.

The record reflects that a videotape of the approximately twenty-seven minute conversation was played for the jury at trial.  The defendant and O'Brien stated several times throughout the videotaped conversation that they believed they were being monitored, and portions of the videotape are difficult to understand because the defendant and O'Brien were whispering or mouthing words.  Throughout the videotape, O'Brien was seen repeatedly feeling and examining the underside of the table in front of him.  At one point, the defendant also looked under the table.

The videotape reflects that O'Brien called himself a cold-blooded killer. O'Brien denied that he intended to shoot anyone, stating that the gun went off, and he became nervous and scared.  O'Brien told the defendant that he was sticking with the story.  The defendant immediately questioned O'Brien about the nature of the story, and O'Brien replied that he said that he stole a van that had the keys inside in a nearby parking lot.  O'Brien told the defendant that he would not say anything about what the defendant did because he did not want the defendant to tell on him.  O'Brien also told the defendant that he hoped that the defendant did not tell what O'Brien had done. O'Brien asked the defendant what the defendant told the officers, and the defendant

replied that he told them that the gun went off and that he did not know exactly what happened. The defendant said that he did not tell the officers that O'Brien did it.

The videotape shows that O'Brien then instructed the defendant not to say anything else, and the defendant replied that he would not and that he would be quiet. O'Brien also told the defendant several times that the defendant only heard shots but that he did not see it happen. The defendant replied each time, "I dreamed it." The defendant stated that he wished that he had dreamed it but that they found the gun. O'Brien told the defendant that the gun would have O'Brien's prints all over it, and the defendant agreed. O'Brien asked the defendant whether the defendant grabbed the gun, but the defendant's response was inaudible. O'Brien then stated, "So, your fingerprints are on it, too?" The defendant and O'Brien then discussed the death penalty and whether O'Brien would be sentenced to death if he was found guilty. The defendant then stated something about Exit 85, and O'Brien replied that they should have gotten off at Exit 85. O'Brien then told the defendant that he was glad that they were in jail because now he did not have to live with it.

The videotape reflects that the defendant and O'Brien also discussed their history of mental illnesses. O'Brien told the defendant that he had some mental problems, and the defendant responded that he also had some problems. O'Brien then stated that he could tell the authorities that they were "happy" when it happened, and perhaps he would not be charged with first degree murder. O'Brien told the defendant that he was charged with first degree murder, attempted murder, and assault with a vehicle on an officer. O'Brien stated that the assault was based on the roadblock, although he did not have any intentions of running anyone down. The defendant replied that someone said that the defendant tried to run through the roadblock.

The videotape shows that O'Brien then stated that he wondered if the room was bugged. He then said the following:

> Don't . . . tell 'em anything I did, just tell 'em stuff that you did, okay? And that'll keep you out of it, okay? Ya' hear. And I'll do the same thing. I'm not going to say anything you did. Only the stuff I did, cause that's all they're worried about. They're not worried about what you did. You can tell 'em your story. . . . No, I'm not gonna tell 'em you did anything with the van. If they ask, I'm just gonna say, "I dunno." All right?

The defendant nodded affirmatively, and O'Brien continued, "This way we don't get ourselves in trouble. Or we get ourselves in trouble, and I give it to you, you give it to me. I'm already looking at twenty to forty years, anyway."

The next several minutes of the videotape are inaudible because the defendant and O'Brien began whispering. It shows that the two continued to talk, discussing the charges, potential sentences, and the procedure for the trial and the appeal. O'Brien told the defendant that the victim got himself untied and called the police, and he said that there was blood on the floor. O'Brien also stated that he should have tried to drive around the cop at the end of the road. The defendant's next statement is unintelligible, and O'Brien stated that he did not have any shots left in the gun. O'Brien told the defendant that they thought that the defendant helped him out and that they were going to shoot them in the car. O'Brien then reminded the defendant not to tell what O'Brien did. O'Brien told the defendant, "All we wanted was the car. We did not want that to happen. You know that. I don't even know why I did that." O'Brien told the defendant again that the defendant could tell the police whatever he wanted as long as he did not involve O'Brien.

The videotape reflects that O'Brien then asked the defendant how many shots he heard and how many shots that he told the police had been fired. The defendant's response was unintelligible. O'Brien then told the defendant, "Alright, that's the one that hit the floor. That's all you need to tell 'em, the one that hit the floor.

Alright?" He explained to the defendant that one shot hit the floor as he was trying to discharge the gun. O'Brien said that he did not know what he was doing because he went into shock, a state of hysteria. O'Brien stated that he wondered what the victim's family was doing, and he then called himself a cold-blooded killer. O'Brien and the defendant then whispered close to each other, and the defendant looked under the table. O'Brien then stated that the defendant did not even need to mention his name. O'Brien told the defendant that when he tried to discharge the gun, "the gun went off. I got scared, nervous. Get it?" The defendant then asked O'Brien where he got the gun. When O'Brien stated that the gun was stolen, the defendant replied several times, "We could have left it there." O'Brien responded that the police would have found the gun, and the defendant stated, "We got our story together." O'Brien told the defendant, "What's done is done."

The defendant made a statement that was unintelligible, and O'Brien responded that the police found it. The defendant then said, "So they know we were in there." O'Brien responded affirmatively, stating that the police found the broken lamp on the floor and that they had a huge box of evidence. O'Brien then reminded the defendant that he did not have to mention O'Brien's name. The videotape ends with O'Brien stating, "You know they're listening."

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is not admissible except as provided by the rules of evidence or otherwise by law. Tenn. R. Evid. 802. Pursuant to Rule 803(1.2)(A), Tenn. R. Evid., the hearsay rule does not exclude a "statement offered against a party that is . . . the party's own statement in either an individual or a representative capacity." The hearsay rule also does not exclude "a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy."

31

Tenn. R. Evid. 803(1.2)(E). Admission into evidence is conditioned upon these facts being proved by a preponderance of the evidence. State v. Stamper, 863 S.W.2d 404, 406 (Tenn. 1993).

Initially, we note that the statements made by the defendant during the conversation with O'Brien qualify as admissions under Rule 803(1.2)(A). Thus, they were admissible. However, we must also determine whether the trial court properly ruled that O'Brien's statements contained on the videotaped conversation meet the requirements for the co-conspirator exception to the hearsay rule. Declarations of a co-conspirator that would otherwise be inadmissible may be offered as proof when the following conditions are met: (1) there is evidence of the existence of the conspiracy and the connection of the declarant and the defendant to it; (2) the declaration was made during the pendency of the conspiracy; and (3) the declaration was made in furtherance of the conspiracy. State v. Gaylor, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992).

The defendant asserts that a conspiracy for hearsay exception purposes does not extend to measures of concealment or obstruction of justice. The state responds that under T.C.A. § 39-12-103(e)(1), the conspiracy was ongoing because the defendant and O'Brien were undertaking measures to conceal the crime and obstruct justice by manufacturing a story to frustrate police investigation. In pertinent part, that statute provides:

> (a) The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes an offense.
>
> . . .
>
> (e)(1) Conspiracy is a continuing course of conduct which terminates when the objectives of the conspiracy are completed or the agreement that they be completed is

32

abandoned by the person and by those with whom the person conspired. The objectives of the conspiracy include, but are not limited to, escape from the crime, distribution of the proceeds of the crime, and measures, other than silence, for concealing the crime or obstructing justice in relation to it.

(2) Abandonment of a conspiracy is presumed if neither the person nor anyone with whom the person conspired does an overt act in pursuance of the conspiracy during the applicable period of limitation.

(3) If an individual abandons the agreement, the conspiracy is terminated as to that person only if and when the person advises those with whom the person conspired of the abandonment, or the person informs law enforcement authorities of the conspiracy and of the person's participation therein.

T.C.A. § 39-12-103. The statute, by its terms, extends the objectives of the offense of conspiracy to commit a substantive crime to include concealing the crime and obstructing justice relative to it.

However, subsection (g) states that the statute is not "intended to modify the evidentiary rules allowing statements of co-conspirators in furtherance of a conspiracy." T.C.A. § 39-12-103(g). The defendant argues that this provision renders T.C.A. § 39-12-103 inapplicable to the determination of whether the co-conspirator exception to the hearsay rule applies. Previous case law is less than clear as to whether the criminal code definition of the offense of conspiracy has any bearing on the requirements for the co-conspirator hearsay exception. See Neil P. Cohen et al., Tennessee Law of Evidence § 803(1.2).6, at 521 (3d ed. 1995).

In State v. Walker, 910 S.W.2d 381 (Tenn. 1995), the defendant was convicted of murder, armed robbery and conspiracy to commit a felony. On appeal, he complained that statements by his co-conspirators made to others well after the murder and robbery occurred were hearsay and improperly admitted into evidence. Thus, the defendant framed the issue as an evidentiary one.

33

In discussing the issue, the court noted that historically all acts or declarations of a co-conspirator may be given in evidence against another co-conspirator

> from the time the conspiracy had its origin until its design has been consummated, or until it is abandoned. But the declarations or acts of one cannot be admitted against another, unless the facts and circumstances warrant the conclusion that a conspiracy was existing at the time of such declarations or acts.

910 S.W.2d at 384-85. However, it also noted the definition of a criminal conspiracy in T.C.A. § 39-12-103, indicating that it abrogated our conspiracy law relative to how long a conspiracy continues, although the court stated that it was applying the prior conspiracy law in effect at the time of the offenses. 910 S.W.2d at 385.

Then the court referred to Rule 803(1.2)(E), Tenn. R. Evid., and noted that the analysis under it was the same as the prior law. It concluded that the robbery conspiracy ended with the robbery and stated that the murder of the robbery victim was incidental to it. As for a conspiracy to conceal the murder and the murder weapon, it concluded that subsequent statements about the robbery and shooting went far beyond concealment and were inadmissible. Id. at 386.

Unfortunately, our supreme court did not explore the relationship, if any, between T.C.A. § 39-12-103 and Rule 803(1.2)(E), Tenn. R. Evid. However, its recognition of the evidentiary rule reflects that the rule will control on the issue of admissibility of hearsay statements. Also, given the express statement in the statute that the evidentiary rules are not modified, we will follow suit in the present case, which does not charge the offense of conspiracy.

As previously noted, historically, a conspiracy to commit a substantive crime did not extend to measures for concealing the crime or obstructing justice, absent specific proof showing that the concealment of the crime or the obstruction of justice

34

furthered the objectives of the conspiracy. Gaylor, 862 S.W.2d at 554 (statements reflecting an ongoing effort to conceal held to be made during the course of conspiracy to commit first degree murder to collect the victim's life insurance when the insurance proceeds, the goal of the conspiracy, had not been collected); see also Grunewald v. United States, 353 U.S. 404, 401-05, 77 S. Ct. 963, 972-74 (1957) ("a vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime"). A continuing agreement to conceal the crime after its commission is not to be implied from the mere fact that a conspiracy to commit the substantive crime existed and overt acts were taken to cover up the crime. See Krulewitch v. United States, 336 U.S. 440, 443-44, 69 S. Ct. 716, 718-19 (1949); Grunewald, 353 U.S. at 401-05, 77 S. Ct. at 972-74.

In the present case, the defendant and O'Brien were spotted in the stolen van around 2:00 p.m. in Jackson, Tennessee, approximately an hour and one-half after the offenses occurred. Any conspiracy to commit the murders and kidnapping would have ended upon their consummation at the church, absent proof by a preponderance of the evidence that the conspiracy continued. On the other hand, the fact that they were using the stolen van to go west would indicate that their goal for the robbery of obtaining a vehicle in order to go to California was still being pursued at the time of their arrest. However, even that goal ended when the two were arrested. Moreover, the recorded discussion between the defendant and O'Brien reflects that no previous agreement to conceal or obstruct justice existed relative to the crimes. Thus, we believe the evidence preponderates against a finding that O'Brien's statements about the offenses were admissible as co-conspirator statements under the original conspiracy. This does not end our inquiry, though. In Walker, our supreme court noted that a separate conspiracy to conceal the circumstances of the original crime

35

could exist and might give rise to the admission of concealment statements in a case in which the original conspiracy is relevant and proven. Such proof existed in this case.

The videotape of the conversation between the defendant and O'Brien reflects that O'Brien told the defendant not to say anything else, and the defendant agreed to remain quiet. The defendant also nodded when O'Brien told the defendant not to tell the police about O'Brien's conduct. We believe that this evidence sufficiently establishes a conspiracy to conceal the earlier committed crimes and to obstruct justice in relation to them.

However, statements made before the existence of the conspiracy are not admissible as a co-conspirator exception to the hearsay rule. Walker, 910 S.W.2d at 385. In this case, the conspiracy to conceal did not begin until O'Brien told the defendant not to say anything else and the defendant agreed, stating that he would be very quiet. Therefore, any statement made by O'Brien before the defendant agreed to be quiet should not have been admitted because the statements were not made during the course of the conspiracy.

As for the statements made by O'Brien after the conspiracy to conceal began, we hold that they were made in furtherance of the conspiracy to conceal the substantive crimes. For the statement to be made in furtherance of the conspiracy, it must advance in some way the objectives of the conspiracy and not merely inform the listener of the declarant's activities. State v. Hutchison, 898 S.W.2d 161, 170 (Tenn. 1994). In this regard, we note that a statement is not in furtherance of the conspiracy if it is merely "a narrative statement of past conduct between the conspirators." Walker, 910 S.W.2d at 386. We also note that casual and purposeless conversation between or among co-conspirators may not satisfy the requirement that the conversation occurred in furtherance of the conspiracy. Id. at 170.

We believe that O'Brien's statements detailing the commission of the offenses advanced the conspiracy to conceal the substantive crimes in that they allowed the defendant and O'Brien to match their stories. Similarly, O'Brien's declarations that he had mental problems suggested that he wanted the defendant to corroborate his story, thus advancing the conspiracy to conceal the crimes. The discussions relating to the evidence obtained by police permitted the defendant and O'Brien to tailor their version of the crimes to the evidence against them.

Although the three requirements for the co-conspirator hearsay exception have been met, the issue now becomes whether O'Brien's statements made during the new conspiracy to conceal the substantive crimes may be used to show the defendant's involvement in the crimes charged. We note that some jurisdictions hold that evidence of the new conspiracy to conceal an earlier, completed conspiracy is inadmissible to show participation in or the acts of the conspiracy to commit a substantive crime. See United States v. DiDomenico, 78 F.3d 294, 303-04 (7th Cir. 1996), cert. denied, 117 S. Ct. 507 (1996). Yet other jurisdictions hold that the statements made by co-conspirators during the cover-up conspiracy are admissible in the trial for the substantive offense if the statements are made at a time proximate to the commission of the substantive crime. See State v. Buschkopf, 373 N.W.2d 756, 764-65 (Minn. 1985); People v. Meagher, 388 N.E.2d 801, 805 (Ill. App. Ct. 1979). We believe that the latter is appropriate, and we conclude that the statements made by O'Brien pursuant to and in furtherance of concealing the original conspiracy that had just ended were admissible.

In addition, we believe that most of O'Brien's statements were admissible in order to give the defendant's statements sensible context. See State v. Jones, 598 S.W.2d 209, 223 (Tenn. 1980). The record reflects that the primary value of the videotape to the state was that it showed that the defendant's mental awareness during

the conversation rebutted his claim that because of his mental condition, he could not form the requisite mental intent. We believe that under <u>Jones</u>, O'Brien's statements were admissible for such purposes. However, <u>Jones</u> holds that a trial court should instruct the jury that such statements are not to be considered as substantive evidence but only as an aid to provide meaning to a defendant's statement. Such an instruction was not given in this case.

In any event, we hold that any error was harmless beyond a reasonable doubt. Although O'Brien's statements contain several references to the specifics of the crimes, the same evidence was properly introduced through other means. Moreover, O'Brien's statements implicated O'Brien and supported the defendant's theory that O'Brien was the shooter. O'Brien called himself a cold-blooded killer and stated that he did not plan on shooting the victims. Also, O'Brien told the defendant what he should and should not tell the police, suggesting that O'Brien was the leader of the two. Under these circumstances, we hold beyond a reasonable doubt that the defendant was not harmed by the admission of O'Brien's statements.

### III. LIMITATION OF EXPERT TESTIMONY

The defendant asserts that the trial court erred by limiting the testimony of Dr. Francois to the contents of his report because he did not include Dr. Francois' name on the list of expert witnesses given to the state as required by Rule 12.2(b), Tenn. R. Crim. P., relating to notice of intent to use expert testimony of the defendant's mental condition. He argues that the trial court incorrectly applied Rule 12.2(b) because Dr. Francois' testimony related to a physical condition, not a mental condition, of the defendant. The defendant contends that the testimony should not have been limited because he complied with the requirements of discovery pursuant to Rule 16(b)(1)(B), Tenn. R. Crim. P., as he gave a copy of Dr. Francois' report to the state before trial.

Before Dr. Francois testified, a bench conference was held, and the state objected to Dr. Francois' testimony because it had neither received Dr. Francois' report during discovery nor been given notice that he would be called as an expert witness. Defense counsel stated that Dr. Francois' report was contained in the staff conference report filed by Dr. Faroogue, although he conceded that Dr. Francois' name did not appear on the report. In response, the state withdrew its objection as long as the testimony of Dr. Francois was limited to the one paragraph contained in the staff conference report. Defense counsel responded that Dr. Francois would only testify about the one paragraph.

The trial court then permitted Dr. Francois to testify but limited his testimony to the paragraph contained in the staff conference report. Contained in the physical examination portion of the staff conference report is a paragraph regarding the physical examination of the defendant on June 1, 1994. It describes the defendant's general appearance, including his height, weight, temperature, pulse and blood pressure. It also states that the findings were normal, with the exception of an enlarged right testicle.

Dr. Francois testified that the results of his examination were that he found a lesion of the right testicle. When defense counsel asked him to describe the lesion, the state objected on the ground that Dr. Francois' testimony was limited to his report, and the trial court sustained the objection. Defense counsel then had Dr. Francois read his findings from his report, including the finding that the defendant had an enlarged right testicle, and asked him what would cause an enlarged right testicle. The state objected on the same grounds, and the trial court sustained the objection. Defense counsel immediately asked for a jury-out hearing in order to make an offer of proof.

During the offer of proof, Dr. Francois testified that the defendant's enlarged testicle could be caused by a birth defect, excessive trauma, abnormal growth or by wrapping a band around the shaft of the penis. He stated that to result in an enlarged testicle, a band would have to be used for a long period of time. He said that it would cause great pain. Dr. Francois stated that the elastic band that was found wrapped around the defendant's waist could also be wrapped around the base of the penis. Defense counsel argued that the excluded testimony was relevant because it corroborated evidence that the defendant used self-inflicted pain to focus his attention elsewhere during a psychotic episode and that the defendant was wearing a strap when he was taken to the jail. The trial court then stated that it had initially bent the rules to permit Dr. Francois to testify.

Pursuant to Rule 12.2(b), Tenn. R. Crim. P., the defendant must give written notice to the state before trial and file a copy of such notice with the clerk if the defendant "intends to introduce testimony relating to a mental disease or defect or any other mental condition of the defendant bearing on the issue of his . . . guilt . . . ." If the defendant fails to provide notice as required, the court may exclude the testimony of any expert witness offered by the defendant on the issue of the defendant's mental condition. Tenn. R. Crim. P. 12.2(d); see also State v. Russell, 735 S.W.2d 840, 842 (Tenn. Crim. App. 1987) (trial court properly excluded evidence of expert testimony on the issue of mental condition when the defendant failed to provide written notice to the state and failed to file a copy of the notice). The defendant must also permit the state to inspect and copy any results or reports of physical or mental examinations. Tenn. R. Crim. P. 16(b)(1)(B).

The state argues that the defendant has waived the issue pursuant to Rule 103(a)(2), Tenn. R. Evid., by failing to object on grounds that the testimony should not have been limited because he complied with Rule 16(b)(1)(B), Tenn. R. Crim. P.,

and on grounds that the trial court erroneously applied Rule 12.2(b), Tenn. R. Crim. P. We do not believe that the issue has been waived. Pursuant to Rule 103(a)(2), Tenn. R. Evid., error may not be based upon a trial court's decision to exclude evidence unless the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context. The defendant followed these requirements.

We hold that the defendant was required to give the state advance notice of his intent to call Dr. Francois as an expert witness under Rule 12.2(b), Tenn. R. Crim. P. We reject his argument that no notice was required because he desired to introduce evidence of a physical condition, as opposed to a mental condition, of the defendant. In this case, the defendant sought to introduce Dr. Francois' testimony to corroborate other testimony of the defendant's mental condition. In this regard, Dr. Francois' proffered testimony qualified as "expert testimony relating to a mental disease or defect" under Rule 12.2(b), Tenn. R. Crim. P. If, as the defendant contends, the testimony related solely to the defendant's physical condition, the evidence would be irrelevant and thus inadmissible. See Tenn. R. Evid. 401, 402. Therefore, the defendant was required to provide the state with advance notice that he intended to call Dr. Francois as an expert witness.

Pursuant to Rule 12.2(d), the trial court may exclude the testimony of any expert witness offered by the defendant on the issue of the defendant's mental condition if pretrial notice of the intent to present such expert testimony is not given. Rule 12.2, Tenn. R. Crim. P., conforms to the federal rule. Committee Comment, Tenn. R. Crim. P. 12.2. The objective of the requirement of pretrial notice is to give the state time to rebut evidence of a defendant's mental condition, which often requires reliance upon expert testimony. See Notes of Advisory Committee on Rules, Fed. R. Crim. P. 12.2(b), 18 U.S.C.A. (West 1986). However, in considering the exclusion of evidence:

41

> evidence should not be excluded except when it is shown that a party is actually prejudiced by the failure to comply with the discovery order and that the prejudice cannot be otherwise eradicated. The exclusionary rule should not be invoked merely to punish either the State or the defendant for the deliberate conduct of counsel in failing to comply with a discovery order. The court's contempt powers should be used for this purpose. Rules 12 and 16, as well as the other Rules of Criminal Procedure were adopted to promote justice; they should not be employed to frustrate justice by lightly depriving the State or the defendant of competent evidence.

State v. Garland, 617 S.W.2d 176, 185-86 (Tenn. Crim. App. 1981) (citation omitted).

In this case, the trial court did not inquire into the potential prejudice to the state by the admission of Dr. Francois' testimony explaining the possible causes of the enlarged testicle. Rather, it summarily ruled that Dr. Francois' testimony should be limited to the statement provided in the report. Before excluding evidence for noncompliance with Rule 12.2(b), the trial court must determine that the admission would prejudice the party against whom the evidence is introduced and that the prejudice cannot be mitigated by other means. Without a proper inquiry by the trial court, there is no way to conclude from the existing record whether the state was prejudiced or whether the prejudice could have been mitigated to such an extent as to allow the admission of the evidence. Therefore, we hold that the trial court abused its discretion by limiting Dr. Francois' testimony to the report without conducting this inquiry.

However, we hold that the error was harmless. Dr. Auble testified that the defendant told her that he inflicted pain on himself by wrapping thick bands around his genitals, allowing him to control tension that resulted from the voices he heard. The defendant's father and stepmother testified that the bands the defendant wore around

42

his arms were so tight that the defendant could barely bend his arms and that the bands caused his arms to swell and become discolored. Evidence was also introduced that the defendant was wearing an elastic band at the time of his arrest. From this evidence, the jury could infer that the defendant wrapped the bands around his genitals, causing the enlargement of his right testicle. We do not believe that the erroneous exclusion of Dr. Francois' testimony more probably than not affected the judgment. See T.R.A.P. 36(b); Tenn. R. Crim. P. 52(a).

## IV. ADMISSION OF 9-1-1 TAPE

The defendant complains that the trial court erred by admitting the 9-1-1 tape because the evidence had little or no probative value and that any probative value was substantially outweighed by the danger of unfair prejudice and by the needless presentation of cumulative evidence. See Tenn. R. Evid. 403. He also argues that the trial court erroneously allowed the state to use the 9-1-1 tape to bolster the uncontradicted testimony of the victim. The defendant contends that the state should have been limited to introducing Mr. Harrington's testimony detailing his conversation with the 9-1-1 operator. The state responds that the trial court did not err by admitting the 9-1-1 tape because the tape was relevant to show the identity of the defendant and O'Brien and because it corroborated several parts of the victim's testimony. The state asserts that the tape is even more reliable than the victim's testimony because it contains statements made moments after the offenses took place. We hold that the trial court erred by admitting the tape but that the error was harmless.

Before trial, the defendant filed a motion to exclude the 9-1-1 tape, arguing that it was inadmissible because it was unfairly prejudicial and constituted hearsay. See Tenn. R. Evid. 403, 802. He argued that the tape was of marginal probative value because neither identity nor the victim's injuries were contested by the defendant. He argued that the tape was extremely inflammatory. The defendant

43

asserted that the victim could testify regarding his statements to the 9-1-1 operator but that the 9-1-1 tape itself was inadmissible because the probative value was substantially outweighed by the danger of unfair prejudice. He also argued that the introduction of the tape constituted improper bolstering of the victim's uncontradicted testimony. The state responded that the 9-1-1 tape was particularly relevant because the victim described the offenses committed against him and the perpetrators. The trial court held that the 9-1-1 tape was admissible, ruling that the probative value outweighed the danger of unfair prejudice.

At trial, the victim testified during direct examination regarding his conversation with the 9-1-1 operator, and the 9-1-1 tape was played for the jury. It reveals that Mr. Harrington told the operator that he and Mr. Weaver had been shot in the head, that there was a lot of blood, and that they needed help. He stated that they were in a dormitory room at the House of God Church on Heiman Street. He said that he and Mr. Weaver worked for National Guardian Security Services and that they were working at the church. Mr. Harrington told the operator that they were eating lunch in a white, Astro van when a white man and a black man forced them inside the dormitory room, shot them, and then took their van. He said that he did not hear the men leave but that they were no longer in the room. Mr. Harrington stated that he did not know the two men and did not know what they were wearing. The tape reflects that when the operator asked Mr. Harrington to describe the perpetrators, Mr. Harrington stated that they were about twenty-five years old.

The 9-1-1 tape also reveals that Mr. Harrington stated several times, "please hurry," and that he asked numerous times whether the police or ambulance were there. The operator responded by telling Mr. Harrington that they were hurrying and by telling him to "hold on," to not talk if it made him feel uncomfortable, or to lie down and to put pressure on his head. Mr. Harrington stated that he heard sirens and

that he saw a white car. The tape reflects that the police and the ambulance had difficulty locating the victims.

On cross-examination, the victim was asked one question: whether he was bound after being made to lie face down. The victim answered yes to the question.

The admissibility of evidence under Rule 403, Tenn. R. Evid., is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). Under Rule 401, Tenn. R. Evid., evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence is generally admissible. Tenn. R. Evid. 402. However, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of delay, waste of time, or needless presentation of cumulative evidence. Tenn. R. Evid. 403. Hearsay is not admissible unless an exception to the rule of exclusion applies. Tenn. R. Evid. 802.

First, we address the defendant's improper bolstering argument. In support of his argument, the defendant relies upon State v. Benton, 759 S.W.2d 427, 433-34 (Tenn. Crim. App. 1988). Initially, we note that Benton was decided before the adoption of the Tennessee Rules of Evidence. In Benton, this court held that the trial court erred by admitting a videotaped statement of the victim. Id. The court reasoned that the videotape should not have been admitted because the victim's credibility had not been attacked on cross-examination. Id. The court stated that:

> prior consistent statements may be admissible, as an exception to the rule against hearsay, to rehabilitate a witness when insinuations of recent fabrication have been made, or when deliberate falsehood has been implied. But before prior consistent statements become admissible, the witness'

45

> testimony must have been assailed or seriously questioned to the extent that the witness' credibility needs shoring up.

Id. at 433-34. We agree that the 9-1-1 tape constituted hearsay and was not admissible because the victim's credibility had not been attacked. However, the evidence was admissible under the excited utterance exception to the hearsay rule. See Tenn. R. Evid. 803(2).

Next, we address the defendant's argument relating to relevance and the exclusion of relevant evidence. In support of his Rule 403 argument, the defendant relies upon State v. Smith, 868 S.W.2d 561 (Tenn. 1993). In Smith, our supreme court addressed the admissibility of a 9-1-1 call from a victim under Rule 403. Identity was a key issue in Smith as the defendant presented an alibi defense. The tape of the 9-1-1 call introduced in Smith contained a statement by one of the victims saying the defendant's name as he was being attacked. Id. at 577. Noting that the call was particularly relevant to establishing the identity of the defendant as the killer, the court ruled that the tape of the 9-1-1 call was admissible. Id. In ruling that the tape was admissible, the court distinguished State v. Pendergrass, 586 P.2d 691 (Mont. 1978), because the tape in Smith contained a statement by one of the victims saying the defendant's name as he was being attacked. Smith, 868 S.W.2d at 577. Pendergrass held that a hysterical emergency call by a rape victim was inadmissible because the prejudicial danger outweighed the tape's probative value and because the evidence was introduced simply to bolster the already overwhelming evidence that the rape occurred, a fact the defendant did not dispute. 586 P.2d at 691.

We conclude that the 9-1-1 tape in the present case was relevant to the material issues of identity and the nature of Mr. Harrington's injuries. See Tenn. R. Evid. 401. The 9-1-1 tape reflects that Mr. Harrington told the operator that a black man and a white man forced him and Mr. Weaver into the dormitory room, shot them,

46

and then took their van. He described the two men as being about twenty-five years old.

On the other hand, although relevant under Rule 401, we conclude that the 9-1-1 tape should have been excluded because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice and the needless presentation of cumulative evidence. See Tenn. R. Evid. 403. The contested issue at trial was the degree of the defendant's involvement, not his identity. The 9-1-1 tape added nothing to show that the defendant actively participated in the offenses. Rather, the 9-1-1 tape related more to the identity of the perpetrators. At trial, the defendant did not dispute that he was present when the offenses occurred, arguing instead that his involvement was limited. Moreover, Mr. Harrington testified virtually to everything that was contained on the 9-1-1 tape, including the identification of the defendant as the person who bound him. In this respect, the evidence was cumulative. Also, unlike Smith, the introduction of the tape presented a danger of unfair prejudice to the defendant. The tape reflects that Mr. Harrington, although not hysterical, feared the return of the defendant and O'Brien, that he was in great pain, that he repeatedly stated "please hurry," that the operator responded by telling the victim to hold on, stop talking, and lie down, and that the police and ambulance had difficulty finding the victim. We believe that there was a risk that the jury could have been inflamed by these statements. We believe that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. Therefore, the trial court erred by admitting the 9-1-1 tape.

The defendant argues that the error was not harmless given the fact that the tape shows that the victim was in pain and feared the return of his assailants and given the prosecutor's reliance upon the tape during closing argument. During closing argument, the prosecutor described the 9-1-1 call as a "bone-chilling" call. He also

47

referred to Mr. Harrington repeatedly saying, "Please hurry, please hurry. I've bled all I can bleed, please hurry, please hurry." The prosecutor argued that Mr. Harrington believed that Mr. Weaver was alive because he heard a gurgling noise. The prosecutor argued that Mr. Harrington feared the return of his assailants. The defendant did not object to the state's closing argument. The state responded that the erroneous introduction of the 9-1-1 tape was harmless because the proof of the defendant's guilt was overwhelming.

We agree that the error was harmless. See T.R.A.P. 36(a); Tenn. R. Crim. P. 52(a). We do not believe that the erroneous introduction of the 9-1-1 tape more probably than not affected the result of the trial. As earlier stated, the 9-1-1 tape added almost nothing to the state's case. The substance of the emergency telephone call was provided through the testimony of the victim. Likewise, though we view the introduction of the 9-1-1 tape as presenting a danger of unfair prejudice, we do not believe that the tape was of such an inflammatory nature as to require a reversal. The victim, though obviously in pain, was coherent and not hysterical. We hold that the trial court erred by introducing the 9-1-1 tape but that the error was harmless.

## V. DOUBLE JEOPARDY

The defendant asserts that his convictions for two counts of especially aggravated burglary violate the double jeopardy clauses of the United States Constitution and the Tennessee Constitution. The defendant was indicted in separate counts for the especially aggravated burglaries of Mr. Weaver and of Mr. Harrington. The counts allege that the defendant entered the House of God Church with the intent to commit first degree murder and that Mr. Weaver and Mr. Harrington suffered serious bodily injury. The defendant argues that because the offense of especially aggravated burglary is a crime against property and not persons, he cannot be convicted of two counts of especially aggravated burglary based on the single entry into the church.

48

The double jeopardy clauses of both the United States and Tennessee Constitutions state that no person shall be twice put in jeopardy of life or limb for the same offense. U.S. Const. amend. V; Tenn. Const. art. I, § 10. The clause has been interpreted to include the following protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 717, 89 S. Ct. 2072, 2076 (1969); State v. Denton, 938 S.W.2d 373, 378 (Tenn. 1996). It is the last protection that is of interest in this case.

In Denton, our supreme court set forth the procedure for analyzing a claim that two offenses are the same for double jeopardy purposes. It stated that the resolution of a double jeopardy punishment issue under the Tennessee Constitution requires the following: (1) an analysis of the statutory offenses under Blockburger v. United States, 284 U.S. 299, 52 S. Ct. 180 (1932); (2) an analysis, guided by the principles of Duchac v. State, 505 S.W.2d 237 (Tenn. 1973), of the statutory evidence used to prove the offenses; (3) a consideration of whether there were multiple victims or discrete acts; and (4) a comparison of the purposes of the respective statutes. Denton 938 S.W.2d at 281. None of the steps are determinative but rather the results of the analysis of each step must be weighed and considered in relation to each other. Id.

The state conceded during oral argument in this case that multiple convictions for especially aggravated burglary are not permissible, and it requested that the especially aggravated burglary conviction relating to Mr. Weaver be dismissed. We agree that double jeopardy principles prohibit convictions for more than one offense of especially aggravated burglary under the circumstances of this case. However, we do not agree that the charges relating to Mr. Weaver must be dismissed because of the double jeopardy violation.

49

A dismissal is not the only legitimate option available when double jeopardy principles are violated. State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997), app. denied (Tenn. June 29, 1998). In Addison, this court stated that:

> there is no need to "dismiss," "vacate," or "strike," a particular "conviction" if what is meant by the term "conviction" is the return of the jury verdict of guilt. Rather, the jury verdict stands as a legitimate finding of fact and law which the trial court should preserve by merging the same offense counts into one judgment of conviction . . . that notes the merger of counts with each other. . . . Such a merger and imposition of a single judgment of conviction protects against double jeopardy and preserves the validity of the jury verdicts for future avoidance of problems related to unnecessarily dismissed "charges" or "convictions." See, e.g., State v. Davis, 613 S.W.2d 218, 221 (Tenn. 1981).

Id.

In this case, the jury returned guilty verdicts for both counts of especially aggravated burglary. The counts charge the same offense of especially aggravated burglary, but each alleges separate injured victims. However, double jeopardy principles are violated by the entry of more than one judgment of conviction imposing more than one sentence for the burglary. Therefore, the separate counts should have been merged, and a single judgment of conviction should have been entered. The nature of the judgment of conviction to be upheld on appeal is controlled by our discussion of the defendant's Oller claim.

## VI. OLLER CLAIM

The defendant contends that the trial court erred by refusing to dismiss the especially aggravated burglary counts. He argues that a dismissal is required under T.C.A. § 39-14-404(d) because the element of serious bodily injury had already been prosecuted for charges of first degree murder and especially aggravated robbery. Pursuant to T.C.A. § 39-14-404(d), the acts that constitute especially aggravated burglary may be prosecuted under the especially aggravated burglary section or any other applicable section, but not both. In support of his claims, the defendant cites

50

State v. Holland, 860 S.W.2d 53 (Tenn. Crim. App. 1993) and State v. Oller, 851 S.W.2d 841 (Tenn. Crim. App. 1992). However, as the state correctly points out, these cases do not require that the counts be dismissed. Rather, they hold that the conviction for especially aggravated burglary must be modified to aggravated burglary when subsection (d) prohibits the prosecution and conviction for especially aggravated burglary. Holland, 860 S.W.2d at 60; Oller, 851 S.W.2d at 843.

We hold that the especially aggravated burglary conviction cannot stand based upon the injuries sustained by Mr. Weaver because it violates T.C.A. § 39-14-404(d). The act of killing Mr. Weaver constituted the serious bodily injury necessary to enhance the offense from aggravated burglary to especially aggravated burglary. In this case, the defendant was prosecuted and convicted of the first degree murder and the especially aggravated robbery of Mr. Weaver.[1] Under these circumstances, T.C.A. § 39-14-404(d) prohibits the prosecution and conviction for especially aggravated burglary based upon Mr. Weaver's injuries. See Oller, 851 S.W.2d at 843. Under Oller, the conviction based upon Mr. Weaver's injuries must be modified to aggravated burglary. Therefore, only a finding of guilt for aggravated burglary remains with respect to the injuries sustained by Mr. Weaver.

However, the especially aggravated burglary conviction stands based upon the injuries sustained by Mr. Harrington because T.C.A. § 39-14-404(d) was not violated. The defendant was prosecuted and convicted of both attempted first degree murder and especially aggravated burglary. The offense of attempted first degree murder does not require a showing of serious bodily injury. State v. Trusty, 919 S.W.2d 305, 313 n.7 (Tenn. 1996). Although the defendant was indicted for the especially

---

[1] We also note that the defendant was charged in separate counts of the indictment with two counts of especially aggravated kidnapping of Mr. Weaver. One count alleged that the kidnapping was accomplished with a deadly weapon, and the other count alleged that the victim suffered serious bodily injury. The state elected to proceed on the charge alleging the use of a deadly weapon, and it dismissed the other count.

51

aggravated robbery of Mr. Harrington, an offense containing serious bodily injury as an element, the charge was dismissed at the close of the state's proof. Therefore, the prosecution and conviction for especially aggravated burglary based upon Mr. Harrington's injuries do not violate T.C.A. § 39-14-404(d).

As earlier noted, double jeopardy principles prohibit the entry of more than one judgment of conviction imposing more than one sentence for the burglary. The jury verdicts of guilt for the offense must be merged. In State v. Banes, 874 S.W.2d 73 (Tenn. Crim. App. 1993), this court stated:

> In the circumstance, in which two guilty verdicts are returned as to alternative charges, the guilty verdict on the greater charge stands and the guilty verdict on the lesser charge merges into the greater charge. The judge should enter a judgment of conviction on the greater offense and a judgment merging the lesser offense into the greater.

Id. at 81. In this case, findings of guilt for aggravated burglary and especially aggravated burglary stand. The finding of guilt for the lesser offense of aggravated burglary merges into the greater offense of especially aggravated burglary. Therefore, we hold that the judgment of conviction relative to Mr. Weaver shall be vacated, and the conviction shall be merged with the especially aggravated burglary conviction relating to Mr. Harrington.

## VII. SENTENCING

The defendant complains that the trial court imposed an excessive sentence. He argues that the trial court erred by applying enhancement factors, by finding that no mitigating factors existed, and by imposing consecutive sentences. The state responds that the trial court imposed appropriate sentences. We agree.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the

52

defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

The sentence to be imposed by the trial court is presumptively the minimum in the range unless there are enhancement factors present. T.C.A. § 40-35-

210(c).[2]  Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors.  T.C.A. § 40-35-210(d)-(e).  The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record.  T.C.A. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

At the sentencing hearing, Mr. Harrington testified regarding the extent of his injuries suffered during the offenses.  He stated that he had undergone fourteen surgeries as a result of his injuries from the offenses, including surgery to repair his inner ear canal and a fracture in his neck and surgery to place a gold weight in his eyelid.  He said that he had also undergone plastic surgery.  Mr. Harrington testified that he had migraines at least twice a week and that he could not function when he had a migraine.  He said that he had surgery on his neck in an attempt to cure the migraines but that it did not help.  Mr. Harrington testified that he had to go to a doctor to receive an injection to relieve the pain, but the injections did not always work.  Mr. Harrington stated that he lost all hearing in his right ear, was partially blind in his right eye, and had problems with balance.  He stated that his eyesight was getting worse and that his eyes did not tear properly.  Mr. Harrington testified that because his facial muscles had deteriorated, his teeth rubbed against his jaw causing sores inside his mouth.  He stated that he had also been treated by a psychologist for depression.

Mr. Harrington testified that he was thirty-six years old when the offenses occurred.  He stated that he had worked at National Guardian for five years and that he had not been able to work since the offenses.  He testified that he had financial problems as a result of his inability to work, requiring him to sell several sentimental

---

[2] For Class A felonies committed on or after July 1, 1995, the presumptive sentence is the midpoint of the range.  See T.C.A. § 40-35-210(c).

possessions to obtain money. He stated that his relationship with his children had been affected and that he and his wife had experienced marital problems as a result of the injuries he sustained. He also said that he could no longer ride or train horses, a hobby that he had enjoyed since he was five or six years old.

Linda Harrington, Mr. Harrington's wife, explained the many ways that her husband's life had been changed by the injuries he sustained from the offenses, including the financial difficulties. She also testified regarding her husband's depression. She testified that Paulette Weaver, the widow of William Rex Weaver, had planned to testify at the sentencing hearing but that she had experienced a nervous breakdown and was unable to attend.

The presentence report reflects that the then thirty-year-old defendant had no prior criminal record. The defendant introduced as exhibits at the sentencing hearing copies of his medical records relating to psychological evaluations and interviews by Dr. Azimi and by Dr. Auble. The medical records relating to the defendant's hospitalization in Illinois were also introduced as well as a copy of his school records that reflect that he did poorly in school and was absent often.

The trial court called Kim Bone, a probation officer. Ms. Bone testified that she went to the jail to interview the defendant as part of her preparation of the presentence report but that the defendant refused to talk to her. She stated that as a result, she was unable to interview the defendant.

At the conclusion of the sentencing hearing, the trial court sentenced the defendant as a Range I, standard offender to twenty years for each Class A felony conviction and to ten years for each Class B felony conviction. The court ordered that

the sentences imposed for the first degree murder and the attempted first degree murder convictions be served consecutively.

The trial court rejected the defendant's theory that he was an unwilling participant in the crimes. It found instead that the defendant did not attempt to stop O'Brien from shooting the victims but instead helped bind the victims. It also stated that the evidence suggested that the defendant might have handled the gun at some point. The trial court stated that the defendant did nothing to disassociate himself from O'Brien as evidenced by the defendant remaining with O'Brien until their arrest.

In sentencing the defendant, the trial court enhanced his sentences for the attempted first degree murder, especially aggravated robbery, especially aggravated kidnapping, and especially aggravated burglary convictions based upon the following enhancement factors pursuant to T.C.A. § 40-35-114:

> (3) the offenses involved more than one victim;
>
> (6) the personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great; and
>
> (10) the defendant had no hesitation about committing the crimes when the risk to human life was high.

The trial court did not explain its factual basis for the application of the enhancement factors. Although the state argued and the defendant conceded that factor (9) applied because the defendant possessed a firearm during the commission of the offense, the trial court did not state that it enhanced the defendant's sentence based upon this factor.

The trial court found that no mitigating factors applied. Specifically, it rejected the following mitigating factors:

> (4) the defendant played a minor role in the commission of the offenses;

56

(8) the defendant was suffering from a mental condition that significantly reduced his culpability for the offenses;

(11) the defendant, although guilty of the crimes, committed the offenses under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct;

(12) the defendant acted under duress or under the domination of the codefendant; and

(13) the defendant had no prior criminal record and was not a violent person.

See T.C.A. § 40-35-113. With respect to consecutive sentencing, the state and the defendant limited their argument to the provision allowing for consecutive sentencing for a dangerous offender. See T.C.A. § 40-35-115(b)(4). However, the trial court did not explain its reasons for ordering the defendant to serve the sentence of life imprisonment for the first degree murder conviction consecutive to the twenty-year sentence for the attempted first degree murder conviction.

## A. ENHANCEMENT FACTORS

The defendant contends that the trial court erred by finding that enhancement factors (3), (6) and (10) applied. First, he asserts that the trial court inappropriately applied enhancement factor (3) because the defendant was indicted separately and convicted of the crimes against each victim. The state concedes that the trial court inappropriately applied factor (3). With the exception of the especially aggravated burglary, we agree that the application of the enhancement factor under the facts of this case was inappropriate. See State v. Williamson, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995) (factor (3) may not be applied when the defendant is separately convicted of the offenses committed against each victim). As mentioned earlier, the aggravated burglary conviction is merged into the especially aggravated burglary conviction. Under these circumstances, enhancement factor (3) is applicable given the fact that the offense involved more than one victim.

57

As for enhancement factor (6), relative to particularly great injuries, the defendant concedes that it may be applied to the attempted first degree murder conviction because it is not an essential element of the offense. See State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995) (holding that particularly great personal injury is not an essential element of attempted first degree murder). However, with respect to the remaining convictions, he argues that great personal injuries are inherent in every especially aggravated robbery, especially aggravated kidnapping and especially aggravated burglary because those offenses require serious bodily injury as an element.

With respect to the offenses of especially aggravated robbery and especially aggravated burglary, these offenses as alleged in the indictment require proof of serious bodily injury. In State v. Jones, 883 S.W.2d 597 (Tenn. 1994), our supreme court concluded that "proof of serious bodily injury will always constitute proof of particularly great injury." Id. at 602. Therefore, factor (6) should not have been applied to these offenses because the factor is an essential element of the offenses.

Relative to the offense of especially aggravated kidnapping, the conviction was based upon the defendant's use of a deadly weapon, not because Mr. Weaver was killed. Thus, particularly great personal injuries are not inherent in the offense of especially aggravated kidnapping. We believe that the severe injuries suffered by the victims qualify as particularly great personal injuries for purposes of enhancing the defendant's sentences under factor (6) for the attempted first degree murder of Mr. Harrington and the especially aggravated kidnapping of Mr. Weaver.

We note that the trial court did not apply factor (9), relative to use of a deadly weapon, although the state argued that it was applicable, and the defendant conceded that the factor is not an essential element of the offense of attempted first

58

degree murder and may be appropriately considered to enhance the sentence. See State v. Jackson, 946 S.W.2d 329, 334 (Tenn. Crim. App. 1996) (factor (9) applicable to attempted first degree murder). We agree that the factor should have been applied to the attempted first degree murder. As for the offenses of especially aggravated kidnapping and especially aggravated robbery, the defendant argues that the factor is an essential element of the offenses as charged. We agree. However, factor (9) should have been considered to enhance the defendant's sentences for especially aggravated burglary because the defendant possessed or employed a firearm during the commission of the offense. The use of a firearm is not an element of especially aggravated burglary. T.C.A. § 39-14-405(a); see also State v. Baker, 956 S.W.2d 8, 17 (Tenn. Crim. App. 1997) (factor (9) applicable to enhance sentence for aggravated burglary conviction). Therefore, factor (9) is applicable to the offenses of attempted first degree murder and especially aggravated burglary.

The defendant argues that factor (9) should be given little weight because the evidence showed that O'Brien stole the gun used in the crimes and that O'Brien, not the defendant, shot the victims. We disagree. Given the fact that the defendant held the gun during the commission of the offenses and disposed of the gun when chased by police, we conclude that factor (9) should be given considerable weight.

Relative to enhancement factor (10), the defendant asserts that it cannot be applied because it is an essential element of the offenses of especially aggravated kidnapping and especially aggravated robbery as both offenses involved the use of a deadly weapon. See State v. Kern, 909 S.W.2d 5, 8 (Tenn. Crim. App. 1995) (factor (10) inapplicable when based solely upon the defendant's use of a deadly weapon). The test for determining whether an enhancement factor is an essential element of an offense is whether the same proof necessary to establish a particular element would also establish the enhancement factor. See Jones, 883 S.W.2d at 601. The

59

determination of whether a particular enhancement factor should be applied is made on a case-by-case basis.  See State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997).

Initially, we note that the trial court failed to state the specific facts supporting the application of factor (10).  At the sentencing hearing, the state argued that the factor applied because several people, including two state troopers, were endangered during the high-speed chase in Jackson.  On appeal, the state asserts without further explanation that the trial court properly applied enhancement factor (10) based upon the defendant's actions at the scene as testified to by Mr. Harrington.

We do not believe that factor (10) is applicable based upon the endangerment of lives during the high-speed chase that took place in Jackson approximately one and one-half to two hours after the commission of the offenses.  We acknowledge that factor (10) may be applied if the facts "demonstrate a culpability distinct from and appreciably greater than that incident to the offense" for which the defendant is convicted.  Jones, 883 S.W.2d at 603 (emphasis added).  This court has held that the factor applies when persons other than the victims alleged in the indictment are placed at risk during the commission of the offense.  State v. Sims, 909 S.W.2d 46, 50 (Tenn. Crim. App. 1995).  The rationale is that when there are others at risk besides the victim, this demonstrates a culpability greater than that required to prove the offense.  Jones, 883 S.W.2d at 603.

In Jones, our supreme court cites State v. Lambert, 741 S.W.2d 127, 134 (Tenn. Crim. App. 1987), as an example of the proper application of enhancement factor (10).  Jones, 883 S.W.2d at 603.  In Lambert, the defendant, before striking two persons, drove an automobile recklessly through the University of Tennessee area of Knoxville while the streets and sidewalks were crowded with motorists and pedestrians. The court explained that the Lambert court properly determined that factor (10) applied

because the defendant created a high risk of death or serious bodily injury to many people before killing the victims, demonstrating a culpability distinct from and appreciably greater than that incident to the offense for which he was convicted. Jones, 883 S.W.2d at 603.

Although we believe that lives were placed at risk during the pursuit by police, we do not believe that the risk was created incident to the commission of the offenses in this case. The police chase did not occur shortly after the commission of the offenses. Rather, the police chase occurred approximately one and one-half to two hours after the crimes were committed. Under these circumstances, factor (10) is not applicable.

However, we believe that based upon Mr. Harrington's testimony, factor (10) is applicable to the especially aggravated kidnapping, especially aggravated robbery, and especially aggravated burglary convictions. Mr. Harrington testified that he was present when the offenses were committed against Mr. Weaver, and Mr. Weaver was present when the offenses were committed against Mr. Harrington. Both Mr. Weaver and Mr. Harrington were in direct peril when the defendant committed the offenses against the other person. Under these circumstances, the facts of this case "demonstrate a culpability distinct from and appreciably greater" than that incident to the offenses as required for the application of factor (10) under Jones. Id. (emphasis added). Therefore, the trial court properly applied factor (10). We believe the factor deserves considerable weight.

## B. MITIGATING FACTORS

Next, the defendant contends that the trial court erred by finding that no mitigating factors applied. First, he argues that the trial court should have considered that he played a minor role in the commission of the offense. See T.C.A. § 40-35-

61

113(4). However, he concedes that the evidence shows that he made statements to a social worker that he held the gun during the commission of the offenses. The defendant also acknowledges that the evidence establishes that he threw the gun out the window when chased by police. The trial court rejected the defendant's theory that he played a minor role and instead found that the defendant actively participated in the crimes. The record supports the trial court's conclusion.

Next, the defendant asserts that there is ample evidence that he was suffering from a mental condition that significantly reduced his culpability for the offenses. See T.C.A. § 40-35-113(8). We agree. The circumstances surrounding the commission of the present offenses are similar to earlier occasions when the defendant was suffering from a mental condition in that the defendant decided to leave home for no reason. The defendant also told Dr. Azimi that he left the dormitory room after O'Brien shot the gun because he heard voices. The personal belongings taken by the defendant for the trip to California suggest that the defendant was suffering from a mental condition. When arrested, the defendant was wearing clothing inappropriate for the weather and was wearing bands similar to those he used to relieve anxiety from auditory hallucinations. Under these circumstances, the factor should have been considered. However, we do not believe that the evidence that the defendant suffered from a mental condition at the time the offenses were committed was strong. Therefore, the factor should only be given minimal weight.

The defendant argues that the trial court should have considered that he committed the crimes under such unusual circumstances that it is unlikely that he had a sustained intent to violate the law, see T.C.A. § 40-35-113(11), and that he acted under duress, see T.C.A. § 40-35-113(12). We disagree. As previously mentioned, the trial court concluded that the defendant was an active participant in the planned crimes.

The record supports the trial court's conclusion. It properly rejected factors (11) and (12).

As for the defendant's contention that the trial court should have considered his lack of a prior criminal record, the state concedes that the factor is applicable. We agree that the trial court should have considered the defendant's lack of a prior criminal record. We hold that the factor should be given moderate weight.

## C. MODIFICATION OF SENTENCES

We need not remand for resentencing due to the trial court's misapplication of enhancement and mitigating factors given the fact that the record is sufficient to conduct a de novo review. Although we conclude that the trial court inappropriately applied enhancement factor (3) and failed to consider mitigating factors (8) and (13) with respect to the attempted first degree murder conviction, the defendant is not necessarily entitled to a reduction in the sentence imposed by the trial court. In consideration of the record before us, we hold that enhancement factor (6), particularly great personal injuries, and enhancement factor (9), possession or employment of a deadly weapon, apply to the attempted first degree murder conviction. See T.C.A. § 40-35-114(6), (9). These enhancement factors are entitled to great weight under the circumstances of this case. We also hold that mitigating factors apply: factor (8), the defendant's mental condition significantly reduced his culpability, and factor (13), the defendant's absence of a prior criminal record. However, the mitigating factors do not deserve great weight. Under these circumstances, the mid-range sentence of twenty years for this Class A felony is justified.

As for the especially aggravated kidnapping conviction, enhancement factors (6) and (10) are applicable. With respect to the especially aggravated robbery conviction, enhancement factor (10) applies. The enhancement factors are deserving

63

of great weight, unlike the applicable mitigating factors (8) and (13). We believe that given the applicable enhancement and mitigating factors, a twenty-year sentence is warranted for the convictions for especially aggravated kidnapping and especially aggravated robbery.

As for the remaining especially aggravated burglary conviction, we hold that the trial court properly sentenced the defendant to ten years incarceration. Enhancement factors (3), (6), (9) and (10) apply to the offense, as do mitigating factors (8) and (13).

### D. CONSECUTIVE SENTENCING

The defendant challenges the imposition of consecutive sentences. He argues that he does not meet the requirements for a dangerous offender under T.C.A. § 40-35-115(b)(4). He also argues that a sentence of life imprisonment consecutive to a twenty-year sentence does not reasonably relate to the severity of the offenses committed by the defendant given his lack of a prior criminal record. The state counters that there is no prohibition against imposing consecutive sentences for youthful, first-time offenders, and it argues that consecutive sentences are warranted in the case. We conclude that consecutive sentences are appropriate in this case.

Initially, we note that the trial court failed to state its reasons for imposing consecutive sentencing. Therefore, our review of the issue of consecutive sentencing is de novo without a presumption of correctness.

The defendant and the state limited their arguments with respect to consecutive sentencing to the provision providing for consecutive sentencing for dangerous offenders. See T.C.A. § 40-35-115(b)(4). We agree that this provision is the only one applicable in this case. Consecutive sentencing may be ordered if the trial

court finds by a preponderance of the evidence that the defendant is "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(4). A finding that the defendant is a dangerous offender will not, standing alone, justify consecutive sentencing. State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995). In addition to a finding that the defendant is a dangerous offender, consecutive sentencing requires further findings that an extended sentence is necessary to protect the public against the defendant's future criminal conduct and that the sentences will reasonably relate to the severity of the offenses committed. Id.

We conclude that ordering the attempted first degree murder sentence to be served consecutively was warranted in this case. We acknowledge that the defendant's youth and lack of a prior criminal record indicate a capability for rehabilitation. However, the defendant's poor school record and excessive absenteeism from school weigh in favor of consecutive sentencing. Also, the circumstances surrounding the offenses reflect particularly violent behavior and show that the defendant has little or no regard for human life and no hesitation about creating a risk to human life. These factors also support a finding that consecutive sentencing is necessary to protect society from the defendant and that consecutive sentences are reasonably related to the severity of the defendant's criminal conduct.

### E. CONCLUSION

In consideration of the foregoing and the record as a whole, we affirm the judgments of conviction for first degree murder, attempted first degree murder, especially aggravated kidnapping, and especially aggravated robbery. We vacate the conviction on the count charging especially aggravated burglary relative to William Rex Weaver and reduce it to aggravated burglary. Also, we merge it with the conviction on the count charging especially aggravated burglary relative to Larry Harrington. We

affirm the judgment of conviction for especially aggravated burglary relative to Larry Harrington but modify the judgment of conviction to reflect the merger of the convictions on the two burglary counts into one especially aggravated burglary judgment.

_____
Joseph M. Tipton, Judge

CONCUR:

_____
Gary R. Wade, Presiding Judge

_____
William M. Barker, Special Judge